**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **AIRCRAFT FUELING SYSTEMS, INC.** | § | |
| | § | |
| *Plaintiff and Counter-Defendant*, | § | |
| | § | |
| v. | § | **Case No. 08-CV-414-GKF-FHM** |
| | § | |
| **SOUTHWEST AIRLINES CO.,** | § | |
| | § | |
| *Defendant and Counter-Plaintiff*. | § | |

**SOUTHWEST AIRLINES CO.'S *DAUBERT* MOTION WITH RESPECT TO
PLAINTIFF'S EXPERT STEPHEN A. JAY AND BRIEF IN SUPPORT**

**ATKINSON, HASKINS, NELLIS,
BRITTINGHAM, GLADD & CARWILE**
A Professional Corporation

John J. Carwile, OBA #10757
Jamie A. Rogers, OBA #19927
525 South Main, Suite 1500
Tulsa, Oklahoma 74101-4524
Telephone:  (918) 582-8877
Facsimile:  (918) 585-8096

and

**CARRINGTON, COLEMAN, SLOMAN
& BLUMENTHAL, LLP**

Kelli M. Hinson, TX Bar No. 00793956
Lindsay R. Barton, TX Bar No. 24050261
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:    (214) 855-3000
Facsimile:    (214) 855-1333
E-Mail: khinson@ccsb.com

*Attorneys for Defendant
Southwest Airlines Co.*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     STANDARD FOR EXCLUDING EXPERTS ..................................................1

III.    ARGUMENT ......................................................................................................2

        A.      Mr. Jay's Testimony is Irrelevant. ..........................................................2

        B.      Mr. Jay's Opinions Are Unreliable. .........................................................4

                1.      Reduction in Labor Expenses. ......................................................7

                        a.      Severance Pay and Benefits ...............................................7

                        b.      Fees and Expenses Associated with RIFs .........................8

                        c.      Payroll Taxes .....................................................................9

                2.      Loss of Delivery Order. ..............................................................10

                3.      Facility and Lease Expenses. .....................................................11

                4.      Excess Infrastructure Costs........................................................13

                        a.      T3 Line.............................................................................13

                        b.      Furniture and Equipment .................................................14

                5.      Adverse Liquidity Costs. ...........................................................16

                6.      Costs of Relocation and Operation. ...........................................17

                7.      Receivable Losses for Outstanding Accounts.............................20

IV.     PRAYER............................................................................................................21

## TABLE OF AUTHORITIES

**CASES**

*A.A. Profiles, Inc. v. City of Fort Lauderdale*,
  253 F.3d 576, 585 (11th Cir. 2001) ........................................................................3

*Bitler v. A.O. Smith Corp.*,
  400 F.3d 1227, 1233 (10th Cir. 2004) .....................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 597 (1993) ............................................................................... Passim

*Dodge v. Cotter Corp.*,
  328 F.3d 1212, 1222 (10th Cir. 2003) ..................................................................2, 4

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48, 60 (2nd Cir. 2002) ..............................................................................6

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,
  960 S.W.2d 41, 50-51 (Tex.1998) ..........................................................................10

*Hathaway v. Bazany*,
  507 F.3d 312, 319 (5th Cir. 2007) .........................................................................11

*Hayes v. Wal-Mart Stores, Inc.*,
  294 F. Supp. 2d 1249, 1251 (E.D. Okla. 2003) .......................................................2

*In re Williams Securities Litigation – WCG Subclass*, 496 F. Supp. 2d 1195, 1230 (N. D.
  Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009) ............................................2, 4

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 147 (1999) ...................................................................................... 1-2

*Lang v. Kohl's Food Stores, Inc.*,
  217 F.3d 919, 924 (7th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001) ..............3, 17

*MicroStrategy, Inc. v. Bus. Objects, S.A.*,
  429 F.3d 1344, 1355-56 (Fed. Cir. 2005) ............................................................ 6-7

*North American Specialty Insur. Co. v. Britt Paulk Insur. Agency, Inc.*,
  Cause No. 06-CV-215, 2007 WL 2694323 at *3-4 (E.D. Okla. Sept. 10, 2007) .....................2

*Snap-Drape, Inc. v. C.I.R.*,
  98 F.3d 194, 198 (5th Cir. 1996) .............................................................................4

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
   395 F.3d 921, 926-27 (8th Cir. 2005) ........................................................................19

*Tittle v. Raines*,
   231 F. Supp. 2d 537, 553 (N.D. Tex. 2002) ...............................................................4

*United States v. Sparks*,
   Cause No. 99-6387, 8 Fed. Appx. 906, 912-13 (10th Cir. May 2, 2001) ..................5

*White-Rodgers Co. v. Bitler*,
   546 U.S. 925 (2005) .....................................................................................................4

**OTHER AUTHORITIES**

FED. R. EVID. 104 .......................................................................................................................2

FED. R. EVID. 401 ...........................................................................................................2, 7, 21

Fed. R. Evid. 402 ...........................................................................................................2, 7, 21

Fed. R. Evid. 403 .......................................................................................................................2

FED. R. EVID. 702 ............................................................................................................2, 4, 7

Federal Rule of Civil Procedure 26(a)(2)(B) ...........................................................................1

**SOUTHWEST AIRLINES CO.'S *DAUBERT* MOTION WITH RESPECT TO PLAINTIFF'S EXPERT STEPHEN A. JAY AND BRIEF IN SUPPORT**

TO THE HONORABLE COURT:

Defendant Southwest Airlines Co. ("Southwest") files its *Daubert* Motion with Respect to Plaintiff's Expert Stephen A. Jay and Brief in Support,[1] and respectfully shows the Court as follows:

## I.  INTRODUCTION

Plaintiff Aircraft Fueling Systems, Inc. ("AFS") proffers Stephen A. Jay on the purported indemnity damages incurred by AFS.  Southwest previously moved to strike Mr. Jay as an expert [Docket Nos. 30, 92] because his report is facially inadequate, fails to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B), and opines on damages that are not recoverable, making his report irrelevant.  On May 5, 2011, Southwest deposed Mr. Jay in an attempt to divine the bases for his opinions, but his testimony only further underscores the irrelevancy and unreliability of his opinions.  Mr. Jay fails to use any methodology beyond regurgitation of AFS's alleged version of the facts and damages.  Accordingly, Mr. Jay's testimony should be excluded.

## II.  STANDARD FOR EXCLUDING EXPERTS

To prevent irrelevant, unfounded, and unreliable opinions from being presented to the jury under the guise of "expert" testimony, the Supreme Court requires trial courts to determine if the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v.*

---

[1] This Motion is filed subject to Defendant's Motion to Strike Stephen A. Jay and Expert Report and Brief in Support and Defendant's Supplement to Its Motion to Strike Stephen A. Jay and Expert Report and Brief in Support. (Docket Nos. 30, 92).

*Carmichael*, 526 U.S. 137, 147 (1999); FED. R. EVID. 401-403 and 702.  Expert testimony is relevant if it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.  *See* FED. R. EVID. 702; *Daubert*, 509 U.S. at 591.  Expert testimony is unreliable if it is not grounded in methods and procedures of science and is no more than subjective belief or unsupported speculation.  *Kumho Tire Co.*, 526 U.S. at 152; *Daubert*, 509 U.S. at 590. "[*A]ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (citation omitted) (emphasis added).  The party seeking to introduce expert testimony has the burden to show that the expert's testimony is admissible.  FED. R. EVID. 104, 702; *In re Williams Securities Litigation – WCG Subclass*, 496 F. Supp. 2d 1195, 1230 (N. D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009). AFS cannot establish that Mr. Jay's testimony satisfies the twin tests of relevancy and reliability as required by *Daubert* and its progeny.  Therefore, this Court should exclude Mr. Jay's testimony or, at least, severely limit it.

## III.  ARGUMENT

### A.    Mr. Jay's Testimony is Irrelevant.

Mr. Jay's testimony is irrelevant because it involves the simplest of calculations, if any, and only serves as a mouthpiece for AFS's version of the facts.  In order to be relevant, expert testimony must aid the trier of fact in answering the question being asked of it.  *See Daubert*, 509 U.S. at 591; *Hayes v. Wal-Mart Stores, Inc.*, 294 F. Supp. 2d 1249, 1251 (E.D. Okla. 2003) (holding that the "touchstone of admissibility of expert testimony is its helpfulness" and expert testimony that gives opinions that the jurors are capable of drawing on their own is inadmissible); *North American Specialty Insur. Co. v. Britt Paulk Insur. Agency, Inc.*, Cause No. 06-CV-215, 2007 WL 2694323 at *3-4 (E.D. Okla. Sept. 10, 2007) (holding that expert

testimony on issues jury members are capable of assessing on their own must be viewed as a "needless presentation" that is not helpful and is thus inadmissible).

As an initial matter, the recoverability of all of the damages on which Mr. Jay opines is based on the indemnity provision in the Master Services Agreement ("MSA"), the contract that governs the parties' relationship.  (App. Ex. 1, Jay Vol. I at 16:2-13; App. Ex. 3, Dep. Ex. 62 at ¶1).[2]  On September 14, 2010, however, this Court ruled that AFS cannot recover its asserted damages under this indemnity provision.  (9/14/2010 MSJ Order [Docket No. 75]).  Mr. Jay failed to supplement his report to provide any additional basis for recovery (App. Ex. 1, Jay Vol. I at 13:1-6), and, in fact, these damages are not recoverable under any viable theory.  For this reason alone, Mr. Jay's testimony should be stricken.  *Cf. A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 585 (11th Cir. 2001) (reversing admission of expert testimony when wrong measure of damages was used by the expert accountant).

Mr. Jay's testimony also does not aid the jury because he only performed basic arithmetic, if any, without regard to the underlying accuracy of the amounts used.  (*See, e.g.,* App. Ex. 1, Jay Vol. I at 66:10-68:14 & App. Ex. 23, Dep. Ex. 106; App. Ex. 3, Dep. Ex. 62 at ¶ 16 & Sch. 8; App. Ex. 1, Jay Vol. I at 91:5-13 & App. Ex. 27, Dep. Ex. 110).   Mr. Jay, who admittedly lacks neutrality, improperly advocates for AFS by simply regurgitating the conclusions and summary data provided to him by AFS.  (App. Ex. 1, Jay Vol. I at 14:1-19 (Mr. Jay stating that: "I'm not familiar with what [Southwest's] side of the case is. So I don't think you call [my report] neutral. I think it's definitely in support of the position that AFS has.")); *see also Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001) (excluding expert testimony, in part, because "[r]elaying the plaintiffs' likely

---

[2] "App." refers to the Appendix in Support of Defendant Southwest Airlines Co.'s *Daubert* Motion, which is filed contemporaneously herewith and incorporated by reference.

testimony is not an example of expertise"); *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996) (rejecting expert opinions that consisted of "mere advocacy"); *Tittle v. Raines*, 231 F. Supp. 2d 537, 553 (N.D. Tex. 2002) (noting expert testimony was not helpful to the jury because it offered "nothing more than what counsel could argue based on the [evidence]").  For these reasons, Mr. Jay's testimony should be deemed irrelevant and excluded.  The lack of any analysis or methodology behind Mr. Jay's calculations and the irrelevancy of his opinions are described more fully in Section B.1 – 7.

### B.     Mr. Jay's Opinions Are Unreliable.

Mr. Jay's testimony also should be excluded because his opinions are unreliable.  AFS has the burden to show that Mr. Jay's testimony is reliable, which requires that his opinions are based upon sufficient facts or data; the product of reliable principles and methods; and the product of a reliable application of those principles and methods to the facts of the case.  *See In re Williams Securities Litigation*, 496 F. Supp. 2d 1195, 1233 (N.D. Okla. 2007) (citing Fed. R. Evid. 702).  Under *Daubert*, any step that renders the expert's analysis unreliable, renders the testimony inadmissible."  *Dodge*, 328 F.3d at 1222 (citation omitted).  When determining the reliability of expert testimony, the Court should direct its focus on the *methodology* employed when reaching the conclusions rather than upon the actual conclusions reached by the expert. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004), *cert. denied sub nom. White-Rodgers Co. v. Bitler*, 546 U.S. 925 (2005).  This includes assessing whether the expert has adequately accounted for alternative explanations or causes.  *In re Williams Securities Litigation*, 496 F. Supp. 1195, 1234-35 (citing Advisory Committee Notes to Rule 702).  Mr. Jay's opinions are unreliable because (1) he relies both on conversations with AFS that consist of nothing more than AFS's unsupported allegations as well as summary documents created and/or produced by AFS without any verification as to the accuracy of them; (2) he renders an opinion on causation,

which he is not qualified to make, and then fails to consider the contractual rights of the parties in determining the amount of damages, if any, AFS incurred; and (3) he fails to consider how actions by those other than Southwest may have caused or contributed to AFS's alleged damages.

Mr. Jay produced sixty documents provided to him by AFS in connection with his expert report.  (App. Ex. 3, Ex. 2 to Dep. Ex. 62; App. Ex. 1, Jay Vol. I at 9:12-10:12).  Excluding the pleadings and contracts, the majority of the documents consist of vendor profiles that summarily list invoice totals; salary and tax information; and summary spreadsheets created by AFS listing its alleged damages.  (*See* App. Ex. 3, Ex. 2 to Dep. Ex. 62)  Mr. Jay asserted that he calculated the amount of damages AFS incurred by interviewing AFS and reviewing the sixty documents provided by AFS.  (*See* App. Ex. 1, Jay Vol. I at 9:12-11:3; 14:1-8).  Mr. Jay acknowledged, however, that he did not verify the accuracy or validity of the amounts provided by AFS, and, in fact, did not know how AFS even calculated some of the figures on which he relied.[3]  *See United States v. Sparks,* Cause No. 99-6387, 8 Fed. Appx. 906, 912-13 (10th Cir. May 2, 2001) (affirming exclusion of accountant expert testimony based, in part, on fact that accountant could not establish authenticity of documents he received from defendants).  Therefore, Mr. Jay's opinions, including the methodologies used, are unreliable.

Moreover, all of Mr. Jay's opinions are based on one of two flawed premises: that AFS incurred damages as a result of (1) Southwest not paying certain fees and expenses in 2005 due

---

[3](*See, e.g.*, App. Ex. 1, Jay Vol. I at 30:2-31:5; 31:12-32:9; 32:24-33:17; 33:18-34:14; 34:15-35:6; 43:20-44:17; 52:21-53:13; 54:25-56:7; 56:20-23; 57:4-8; 60:7-9; 61:13-62:10; 62:22-63:6; 66:3-9; 69:10-70:23 & App. Ex. 24, Dep. Ex. 107; App. Ex. 1, Jay Vol. I at 75:9-76:11 & Dep. Ex. 73; App. Ex. 1, Jay Vol. I at 76:12-77:7 & App. Ex. 27, Dep. Ex. 72; App. Ex. 1, Jay Vol. I at 79:14-80:25; 81:17-83:19 & App. Ex. 25, Dep. Ex. 108; App. Ex. 1, Jay Vol. I at 84:24-86:6; 86:15-87:24; 91:5-13 & App. Ex. 27, Dep. Ex. 110).

to a dispute between the parties regarding overpayment by Southwest; and (2) Southwest putting the Houston, Baltimore, and Dallas projects out to bid in 2005. (App. Ex. 1, Jay Vol. I at 95:13-96:5).[4]  Mr. Jay admits that he is not qualified, and therefore, is not rendering an opinion as to whether these actions by Southwest were proper pursuant to the Master Services Agreement or contract law (App. Ex. 1, Jay Vol. 1 at 95:13-96:5), but yet he does purport to opine on the extent those actions by Southwest caused AFS to incur damages.  (*See* App. Ex. 1, Jay Vol. I at 14:1-8 & App. Ex. 3, Dep. Ex. 62).  Even more problematic is that Mr. Jay fails to consider that the MSA provides Southwest with the unequivocal right to issue notices not to proceed on individual projects and to terminate the MSA with thirty days' notice.  (App. Ex. 32-A, [MSA] §§  4, 6K; *see also*, *e.g*., App. Ex. 1, Jay Vol. I at 53:6-21).  As a result, Mr. Jay proffers opinions that Southwest is responsible for remote damages that AFS allegedly incurred years after those actions taken by Southwest, rendering his opinions completely unreliable.[5]  (*See*, *e.g.*, App. Ex. 3, Dep. Ex. 62 at 7-8 & Schs. 6-7).

Compounding the lack of reliability of Mr. Jay's opinions is that he did not consider whether actions by those other than Southwest could have resulted in AFS's alleged damages.  (*See*, *e.g.*, App. Ex. 1, Jay Vol. I at 37:20-23 [Q: In preparing your Schedule 1, did you inquire into whether AFS's unemployment was affected by actions of those other than by Southwest? A: No.]; 53:3-5; 83:24-85:23); *see MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005) (affirming exclusion of expert when he ignored other potential factors for

---

[4] In fact, Mr. Jay states that his assignment was to calculate the damages incurred "due to the fact that [AFS] lost its contract with Southwest."  (*See* App. Ex. 1, Jay Vol. 1 at 14:1-8).

[5] Moreover, with the exception of a portion of opinion 1, Mr. Jay is not qualified to render opinions on these remote damages due to AFS's demise.  At most, Mr. Jay is qualified to render opinions on the value of the business and to audit its records.  (*See* App. Ex. 1, Jay Vol. I at 7:1-9:11); *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2nd Cir. 2002) (affirming exclusion of expert testimony because expert was qualified to opine on value of Fashion Boutique's business, not on cause of business demise).

plaintiff's misfortune).  For all of these reasons, Mr. Jay's testimony is unreliable and should be stricken.

The testimony regarding Mr. Jay's individual opinions further highlights the lack of relevancy and reliability in the methods he employed.

### 1.   *Reduction in Labor Expenses.* [6]

Mr. Jay's first opinion is that Southwest's actions in putting the Dallas, Houston, and Baltimore projects out to bid caused AFS to lay off 23 employees in two reductions in force ("RIFs") in June and October 2005, which resulted in $82,000 in damages.  (App. Ex. 3, Dep. Ex. 62 at 2-3)  The basis for this opinion, however, is nothing more than arithmetic based on unverified data.  Mr. Jay fails to provide any analysis of the factors that contributed to RIFs, compute the cost savings that would have resulted from any RIFs,[7] or take into account that AFS had no justifiable expectation of permanent employment under the MSA.  (App. Ex. 32-A [MSA] §§ 4K, 6; see also App. Ex. 1, Jay Vol. I at 15:10-16:1; 18:23-19:25; *see also* App. Ex. 1, Jay Vol. I at 37:20-23); *MicroStrategy*, 439 F.3d at 1355-56 (affirming exclusion on expert when he ignored other potential factors for plaintiff's misfortune).  Consequently, Mr. Jay's opinions regarding costs associated with AFS's reduction in work force are unreliable, illogical, and irrelevant, and should be inadmissible.  *See* FED. R. EVID. 401, 402, and 702.  AFS's alleged damages related to layoffs fall into three categories:

### a.   Severance Pay and Benefits

For each of the 23 employees laid off (App. Ex. 6, Dep. Ex. 65; App. Ex. 1, Jay Vol. I at 20:1-21:8), Mr. Jay includes in his calculation not only the gross severance pay, but also

---

[6] (*See* App. Ex. 3, Dep. Ex. 62 at Sch. 1).

[7] Presumably, AFS would not have engaged in reducing its work force if there were not costs savings associated with such actions.

employer Medicare, employer FICA, state unemployment tax, workers' compensation, 40lK, and fringe benefits (dental insurance, health insurance, and long-term disability insurance) for that employee.  (*See* App. Ex. 28, Dep. Ex. 114 [Severance Pay Chart]; *see also* App. Ex. 1, Jay Vol. I at 22:17-23:21).  Mr. Jay was unable to explain how these additional expenses were allegedly caused by Southwest's actions.

### b.    Fees and Expenses Associated with RIFs

Mr. Jay also includes in his damage model the fees associated with professional career counseling and administrative personnel used in the RIFs.  (App. Ex. 1, Jay Vol. I at 28:1-7).  Mr. Jay's "methodology" for this opinion was merely to add up the numbers that AFS gave him.

For the professional career counseling fees, Mr. Jay simply adds up the number of hours that AFS told him an outside consulting firm, Foreman & Associates ("Foreman"), spent in activities related to the RIFs, multiplied by the rate of $112.50 an hour.[8]  (*See* App. Ex. 1, Jay Vol. I at 31:6-21 & Dep. Exs. 64; *see also* App. Ex. 1, Jay Vol. I at 28:1-29:4).  Although AFS provided Mr. Jay with Foreman's summaries of their activity, Mr. Jay included in AFS's damages time entries that make no mention of the RIF.  (*See id.*).  Mr. Jay was also unable to point to any document that could substantiate that AFS actually paid Foreman any amount, much less an amount above and beyond its standard retainer fee.  (*Id.*).  Mr. Jay did no more than accept AFS's version of the facts, despite the lack of any supporting documentation.

The amount of fees calculated for the administrative personnel is equally unreliable and irrelevant.  For this element of damages, Mr. Jay just multiplied the number of hours that AFS told him that HR and Accounting personnel had spent working on the RIFs and multiplied by the

---

[8] This hourly rate was taken from a retainer agreement with Foreman that expired a year before the layoffs.  (See App. Ex. 1, Jay Vol. I at 29:4-31:5 & App. Ex. 4, Dep. Ex. 63).  Mr. Jay has no knowledge of what the actual hourly rate was.

rate of $44 per hour.  Mr. Jay never received any time sheets or other documents that verified the number of hours allegedly spent by HR and Accounting in connection with the RIFs.  (App. Ex. 1, Jay Vol. I at 32:24-33:17).  Mr. Jay did not even know how AFS calculated the number of hours involved in layoffs, and he admitted that AFS could have erred in its calculation.[9]  (App. Ex. 1, Jay Vol. I at 33:18-34:14).  Moreover, Mr. Jay did nothing to verify that the rate of $44 per hour had any connection to the amount that AFS's employees were actually paid.  (App. Ex. 7, Dep. Ex. 66).  (App. Ex. 1, Jay Vol. I at 34:15-25).  In fact, Mr. Jay assumed, but could not confirm, that these amounts were *not* paid on top of the salaries that these employees already received, meaning that Mr. Jay did not believe AFS actually incurred *any* expenses beyond the salaries AFS was already obligated to pay.  (App. Ex. 1, Jay Vol. I at 35:1-9).  Mr. Jay's flawed methodology lacks any independent verification of the facts and constitutes nothing more than the summation of numbers provided by AFS.

### c.    Payroll Taxes

Even more absurdly, Mr. Jay includes AFS's increase in payroll taxes in his calculation of the damages caused by Southwest.  Even if Southwest Airlines could somehow be responsible for an increase in payroll taxes due to AFS's layoffs in 2005 (which it cannot), there is no methodology that would assess 100% of those increases for the next four years to Southwest. (*See* App. Ex. 1, Jay Vol. I at 22:8-16; 37:17-19).  Again, Mr. Jay relies on a spreadsheet created by AFS in order to calculate these alleged taxes.  (*See* App. Ex. 13, Dep. Ex. 76).  Mr. Jay

---

[9] For example, in June and October of 2005, AFS purportedly laid off 10 and 13 employees, respectively.  The chart AFS prepared for Mr. Jay to use in his testimony lists the number of employees laid off in October as 15.  It appears that AFS arbitrarily came up with the number of hours that HR and accounting spent on layoffs in June of 2005 and then multiplied those hours by a factor of 1.5 to come up with the hours for the October layoffs, on the incorrect assumption that 15 employees were laid off at this time (1.5 times the number in June).  (App. Ex. 1, Jay Vol. I at 33:18-34:14).

admitted in his deposition that there was an error on the spreadsheet regarding the taxable rate listed for 2007. (*See* App. Ex. 1, Jay Vol. I at 36:10-37:16). But he nevertheless used this erroneous tax rate in his calculation, rendering the methodology unreliable. (*See* App. Ex. 13, Dep. Ex. 76 & App. Ex. 29, Dep. Ex. 114 [Payroll Costs]; *see also* App. Ex. 1, Jay Vol. I at 96:21-97:3). Further, while Mr. Jay may have produced some documents to substantiate the payroll tax rate, many of the other quarterly numbers on the spreadsheet are unverifiable because Mr. Jay did not produce all of the OESC quarterly reports that supposedly support his calculations. (App. Ex. 31-A-C [Jay 25-27]).

In short, Mr. Jay performed no analysis, failed to verify all of the data provided to him, used improper calculations, and has done nothing more than add up the numbers that AFS provided. Accordingly, Mr. Jay's testimony on this issue is speculative, irrelevant, illogical, and unreliable.

### 2. *Loss of Delivery Order.*

Mr. Jay lists more than $882,000 as damages associated with an unspecified delivery order related to a separate contract to which Southwest was not a party. (App. Ex. 3, Dep. Ex. 62 at 4 & Sch. 2). Mr. Jay asserts that Southwest's actions made AFS "illiquid," and therefore AFS's poor financial condition somehow resulted in the loss of this delivery order to a third party with which Southwest had no involvement. (*Id.*). Mr. Jay admitted both that he did not know whether AFS had originally been awarded the delivery order under the original contracts and that he has never seen any documentation that would validate AFS's speculation that it lost this delivery order due its alleged illiquidity.[10] (App. Ex. 1, Jay Vol. I at 39:1-40:10).

_____

[10] The contracts submitted by AFS indicate that the owner had the right to exercise the option to extend delivery orders, not that AFS was in any way guaranteed those delivery orders. (App. Ex. 17, Dep. Ex. 99 at AFS43877 and 43939). In such an instance, there is *no* reliable basis on which the lost delivery order could be calculated. *See, e.g., Formosa Plastics Corp. USA v.*

Logic dictates that the most important information in calculating the damages caused by the loss of a delivery order would be the bid that AFS actually submitted for that order. But Mr. Jay could not rely on that bid because AFS never provided him with it. (App. Ex. 1, Jay Vol. I at 44:2-45:16). As demonstrated in schedule 2 of Mr. Jay's report, he instead simply assumed (without any basis) that the fee for the new delivery order would be an average of the prior four delivery order fees. (App. Ex. 1, Jay Vol. I at 44:2-45:16). Even if this "methodology" had some validity, Mr. Jay did not even verify the prior fees on which he based his average. AFS created the summary spreadsheet containing the data regarding the previous maintenance orders. Mr. Jay relied on this spreadsheet for his calculation, but he could not explain what the various numbers represented nor did he see any back-up that would validate that AFS was, in fact, paid those amounts for the previous delivery orders. (App. Ex. 1, Jay Vol. I at 42:17-44:1 & App. Ex. 17, Dep. Ex. 99). Jay's irrelevant, unreliable, illogical, and unsupported opinion regarding the loss of an unspecified contract unrelated to Southwest should be deemed inadmissible in its entirety. *See Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (affirming exclusion of expert testimony where expert offered no "specific factual support for the reliability of his initial assumptions").

Again, to the extent Mr. Jay is simply doing math, his testimony is not helpful to the jury, and he has failed to perform any other analysis or verify the accuracy of the underlying data.

### 3. *Facility and Lease Expenses.*

Despite the fact that AFS continued to reside in its "main lease facility" for the entire term of the lease, Mr. Jay seeks to hold Southwest responsible for the amount of lease facilities

---

*Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50-51 (Tex.1998) (holding plaintiff could not show damages without evidence that, even if it had made a particular bid, it would have been awarded project).

that AFS allegedly no longer needed from June of 2005 through 2007 because of the loss of the Southwest and "other long-term contracts."    (App. Ex. 3, Dep. Ex. 62 at 5 & Sch. 3; App. Ex. 1, Jay Vol. I at 46:24-47:21).   Mr. Jay calculates this "excess" lease facility by adding up the amount of the lease payments over twenty-four months from a vendor profile as printed off by AFS.  (App. Ex. 1, Jay Vol. I at 49:7-50:3 and App. Ex. 18, Ex. 100).  He then includes in his calculation other fees above the rent expense for which he can offer no explanation.  (*See* App. Ex. 18, Dep. Exs. 100 [includes items added by Jay] & App. Ex. 19 101 [agreement listing rent expense]).  From that, Mr. Jay subtracts out 22 months of payments for what it allegedly would have cost AFS to rent a significantly smaller space.[11]  (App. Ex. 1, Jay Vol. I at 48:22-49:6).  Mr. Jay concedes that he never saw the actual invoices to verify what AFS claimed it paid for the main lease.  (*Id.* at 52:21-53:2).  Additionally, while attributing all of the additional main lease space to Southwest, Mr. Jay was unable to answer whether AFS had taken any proactive steps to attempt to sublease the main lease.  (*Id.* at 53:3-5).  And despite referencing that AFS had contracts with customers other than Southwest, Mr. Jay does not attribute any percentage of business to those customers or to the amount of lease space needed as a result of those other customers. (*See* App. Ex. 3, Dep. Ex. 62 at 5 & Sch. 2).  Perhaps most glaringly, when Mr. Jay was calculating the two years of additional main lease space, he did not take into account the fact that the MSA includes a thirty day termination provision and a notice not to proceed provision. (App. Ex. 1, Jay Vol. I at 53:6-21).

Finally, Mr. Jay seeks an amount for the amortization of the leasehold improvements. Not only is the damage unrecoverable as viable theory of recovery, but Mr. Jay admits that he

---

[11] Mr. Jay could not actually recall how many months of the smaller lease space he subtracted out from the main lease costs, but agreed with Southwest's counsel that she was "probably right that [he] only used  . . . 22 months on that . . . ."  (App. Ex. 1, Jay Vol. I at 48:22-49:6).

already included the amount of the leasehold improvements in the cost of the main lease[12] and, therefore, this amount constitutes double recovery.   (*See* App. Ex. 1, Jay Vol. I at 50:19-52:7). Mr. Jay's opinion on excess lease space is fatally flawed -- his simple addition and subtraction lacks supporting facts, is riddled with errors, and fails to take into account the parties' contractual rights or other factors that contributed to AFS's alleged damages.

        4.    *Excess Infrastructure Costs.*

        a.    **T3 Line**

Mr. Jay opines that AFS incurred $230,316 (excluding monthly storage fees) in costs for excess infrastructure, which consists of the fees for a T3 telephone/data line and "excess" office furniture and equipment.  (App. Ex. 3, Dep. Ex. 62 at 6 & Sch. 4).  Failing to provide any factual support as to why Southwest is responsible for these fees, Mr. Jay yet again uses a flawed methodology without any substantiation of the amounts relied on.  For the T3 line, Mr. Jay seeks the difference in the cost between a T3 line and T1 line, which according to Mr. Jay is ½ the amount of a T3 line. (*See* App. Ex. 1, Jay Vol. I at 56:20-23).  Mr. Jay reaches this conclusion because that is what AFS told him.  (*See id.*).  Mr. Jay can provide no documentation or other support that a T1 is actually half the price of a T3 line or that a T1 line would have been sufficient for AFS's needs.  (*Id.* at 56:20-23; 57:4-8).  Moreover, the only contract Mr. Jay can point to showing that AFS was in fact obligated to pay for any data line was a contract for the amount of $599 a month, not the approximately $1084 that AFS alleges it was obligated to pay. (*Id.* at 54:25-56:7 & App. Ex. 21, Dep. Ex. 103).  Tellingly, the vendor profile that AFS gave to Mr. Jay from which he added up the costs of the T3 line (as identified by AFS) establishes that AFS continued to pay that amount for at least another nine months after its alleged contract for

---

[12] These fees were part of the unidentified fees included on Dep. Ex. 100.

the T3 line expired.  (App. Ex. 1, Jay Vol. I at 55:15-19; 56:16-19; 57:9-58:9 & App. Ex. 21, Dep. Ex. 103).  Thus, any claim that AFS did not need the T3 line is meritless.  Finally, even if AFS could recover for this alleged damage, the simple arithmetic employed by Mr. Jay does not require the assistance of an expert.  The damage amount is calculated by simply adding up the amount of the T3 line as identified by AFS for the time period in which AFS told him it was obligated to pay for it and dividing it in half as AFS told him was appropriate.  (*See* App. Ex. 3, Dep. Ex. 62 at 6; App. Ex. 1, Jay Vol. I at 54:20-23).  Mr. Jay has added no expertise or analysis that would be helpful to the jury.

### b.   Furniture and Equipment

Mr. Jay also seeks the estimated loss of furniture and equipment that AFS stored in 2007 and later turned over to the storage company in lieu of outstanding storage fees.  (App. Ex. 3, Dep. Ex. 62 at 6 & Sch. 4; App. Ex. 1, Jay Vol. I at 58:10-16; 59:6-18; 60:22-25).  Mr. Jay's methodology is unsound and unreliable.  As an initial matter, Mr. Jay includes an estimated loss for Tulsa into-plane equipment.  (App. Ex. 3, Dep. Ex. 62 at Sch. 4)  Not only did Mr. Jay never see the invoices to confirm the cost basis of the Tulsa into-plane fueling equipment, but any claim or damage related to Tulsa into-plane fueling was released by AFS in the settlement of a prior suit.[13]   (App. Ex. 1, Jay Vol. I at 62:11-63:6; 63:12-65:13).  Despite receiving that settlement agreement from the prior litigation, Mr. Jay admitted that it did not influence his opinion as to whether this expense should be included in AFS's damage model.  (*Id.* at 63:12-

---

[13] The release language states, in part, "AFS . . . hereby release[s] and discharge[s] Southwest Airlines . . . from any claims, demands, disputes, causes of action, obligations, costs, damages or liabilities of any nature whatsoever, suspected or claimed, fixed or contingent . . . that were raised in the Litigation, including any claims or counterclaims arising from or relating to: (1) the fuel facility maintenance and operations, into-plane fueling, and GSE fueling services performed by AFS for Southwest Airlines at the Tulsa International Airport and the El Paso International Airport; (2) Southwest Airlines' termination of such services . . ." (Dep. Ex. 104, § 2.1).

65:13 & Dep. Ex. 104 [not included in the appendix to this Motion due to confidentiality provision]).[14]  Moreover, Mr. Jay estimated the loss on the equipment and furniture by using a spreadsheet created by AFS that totaled the purported cost bases for these items and then multiplying those figures by 20%.  (App. Ex. 1, Jay Vol. I at 66:10-67:10 & App. Ex. 23, Dep. Ex. 106; *see also* App. Ex. 22, Dep. Ex. 105).  Mr. Jay did not confirm the cost bases as listed in AFS's spreadsheet by looking at the actual invoices or any other documentation.  (App. Ex. 1, Jay Vol. I at 66:3-9).  And despite the fact that the equipment and furniture was purchased at various times between the years of 2000-2005, Mr. Jay ignored accepted accounting principles and arbitrarily estimated the loss of use at 20% for every asset rather than taking into account how much each individual asset depreciated.  (App. Ex. 1, Jay Vol. I at 66:7-68:2).  Additionally, the spreadsheet from which Mr. Jay calculated the estimated loss included some assets that were purchased after June of 2005, *after* the alleged breach of contract by Southwest.  (App. Ex. 23, Dep. Ex. 106).  Besides pure speculation, Mr. Jay could not provide an explanation for how Southwest's alleged breach could have caused AFS to buy *more* furniture.  (App. Ex. 1, Jay Vol. I at 68:3-14).  Moreover, while Mr. Jay admitted that AFS gave this equipment and furniture in exchange for approximately $5000 in owed storage fees, he did not take that into account when determining that the value of the equipment was $221,761 – more than 44 times that amount.[15] (*Id.* at 61:1-62:10).  Nor was Mr. Jay able to answer what the storage company did with the machinery and equipment and whether AFS ever attempted to recover this purported excess

---

[14] Because of the confidentiality provision in the settlement agreement, Southwest is not including a copy of the agreement in the Appendix to this Motion.  Upon request from the Court, Southwest will submit the agreement for an *in camera* review by the Court.

[15] In fact, Mr. Jay could not even decide whether it was any indication of the value of the equipment that AFS was willing to exchange the alleged $221,000 worth of equipment for approximately $5,000 in storage fees.  Instead, he said that AFS would have to answer that question.  (App. Ex. 1, Jay Vol. I at 62:3-10).

value that was above the owed storage fees. (*Id.* at 61:20-62:2). For any or all of these reasons, Mr. Jay's opinion regarding the costs of the excess T3 line, furniture, and equipment is unreliable, irrelevant, illogical, and should be deemed inadmissible.

5.     *Adverse Liquidity Costs.*

In a total of four sentences, Mr. Jay makes the conclusory statement that AFS incurred more than $422,000 in costs and expenses because of a reduction in AFS's "financial liquidity." (App. Ex. 1, Dep. Ex. 62 at 7 & Sch. 5). Mr. Jay does not conduct any analysis of the reasons for AFS's precarious financial status, the impact of the respective factors, or how Southwest was allegedly responsible for AFS's inability to operate a profitable business. Mr. Jay simply assumes, in direct contravention of the terms of the Master Services Agreement, that AFS was entitled to Southwest's business in perpetuity. (App. Ex. 32-A, [MSA] §§ 6, 4K) Mr. Jay's "methodology" was simply to add AFS's tax consultant fees, accountant fees, legal fees, and tax penalties incurred since 2005. (*See* App. Ex. 3, Dep. Ex. 62 at 7 & Sch. 5; *see also* App. Ex. 1, Jay Vol. I 69:2-78:6). The two tax consultant fees were for work performed in 2008, and in no way can be attributable to Southwest's actions from 2005. (App. Ex. 1, Jay Vol. I at 69:10-70:23 & App. Ex. 24, Dep. Ex. 107; App. Ex. 1, Jay Vol. I at 76:12-77:7 & App. Ex. 10, Dep. Ex. 72). Moreover, even if this work was somehow related, Mr. Jay received no invoices or a description of the work performed by the tax consultants. (*Id.*) Similarly, Mr. Jay received no invoices substantiating the fees AFS allegedly incurred from accountants at Stanfield & O'Dell nor a description of the services provided. (App. Ex. 1, Jay Vol. I at 75:9-76:11 & App. Ex. 11, Dep. Ex. 73). And of all of the legal fees Mr. Jay seeks to impose on Southwest, only one invoice is provided, which clearly indicates that the legal services rendered were in connection with a prior lawsuit between AFS and Southwest. (*See* App. Ex. 1, Jay 71:9-72:12 & App. Ex. 8, Dep. Ex. 69; App. Ex. 1, Jay Vol. I at 72:17-73:9; 72:17-75:8 & App. Ex. 9, Dep. Ex. 71). Mr. Jay makes

no attempt to analyze these purported expenses to determine if they were in any way caused by Southwest's allegedly wrongful conduct.  (App. Ex. 1, Jay Vol. I at 71:9-72:16; 74:12-75:8); *see Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 923-24 (7th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001) (excluding expert testimony, in part, because the experts short report contained unreasoned assertions and did not provide proper analysis).

In addition to the consultant fees, Mr. Jay also saddles Southwest with AFS's federal tax penalties.  (App. Ex. 3, Dep. Ex. 62 at Sch. 5).  Mr. Jay concedes that Southwest is not responsible for AFS's underlying tax obligations (App. Ex. 1, Jay Vol. I at 77:8-78:6) but, without explanation, Mr. Jay includes in the "damages" allegedly recoverable from Southwest the penalties, interests, and fines AFS incurred by failing to pay its tax obligations.  (*Id.* & App. Ex. 3, Dep. Ex. 62 at 7 & Sch. 5).  Mr. Jay calculates this amount -- $110,028 – simply by adding together the numbers given to him by AFS.  (*See* App. Ex. 30, Dep. Ex. 114 [Summary of Penalties and Interest with IRS]).  Jay's opinions regarding AFS's financial liquidity are irrelevant, unreliable, contrary to the law, based on an unsound or nonexistent methodology, and therefore should be deemed inadmissible.

### 6. *Costs of Relocation and Operation.*

Mr. Jay also claims Southwest is responsible for AFS's 2007 relocation expenses and operational salaries and costs through 2008.  (App. Ex. 3, Dep. Ex. 62 at 7-8 & Schs. 6-7).  Mr. Jay can offer no explanation as to how Southwest caused these alleged damages other than to point to the parties' 2005 dispute over payment and severance of their relationship.[16]  (App. Ex. 1, Jay Vol. I at 78:7-20).  Mr. Jay wholly failed to take into account other considerations that

---

[16] Unbelievably, Mr. Jay asserted that he had no opinion as to whether Southwest was required to use AFS *indefinitely* as a contractor, which underscores the unreliability of all of his opinions. (App. Ex. 1, Jay Vol. I at 78:25-79:12).

could have contributed to AFS needing a smaller lease space, and though the contract gives Southwest the right to terminate the MSA upon thirty days' notice and to issue notices not to proceed, the MSA provisions did not influence Mr. Jay in determining how long AFS's damages would continue.  (*See id.* at 78:21-24).  Mr. Jay also failed to consider when the projects that were put out to bid were scheduled for completion, even though Mr. Jay concedes that if they were scheduled for completion prior to June of 2007, AFS would likely have needed a smaller space anyway.  (*See id.* at 78:25-79:8).

With regard to the relocation expenses, Mr. Jay assesses Southwest with $383,331 in moving costs ($71,652 for preparation of new facilities and $311,680 for internal staff costs).  (App. Ex. 3, Dep. Ex. 62 at 7-8 & Sch. 6).  Mr. Jay once again relied on documents created by AFS to form his opinion.  With respect to the cost for preparation of new facilities, Mr. Jay could not identify how the summary of costs provided by AFS was related to the move or even provide a description of what the expenses were for, with the exception of one build-out invoice.  (App. Ex. 1, Jay Vol. I at 79:14-80:25; 81:17-22; and App. Ex. 25, Dep. Ex. 108).  Mr. Jay was similarly at a loss for information with regard to the $311,680 in internal staff costs.  Mr. Jay relied on a spreadsheet that listed AFS's employees and allocated hours and pay to the move from April 2007-October 2007.  (App. Ex. 1, Jay Vol. I at 81:23-82:3; 83:16-19; App. Ex. 25, Dep. Ex. 108).  But the only information that Mr. Jay verified was the amount AFS paid each employee based off the W-2's.  (*Id.* at 81:23-82:18).  Mr. Jay acknowledged that he could not validate the hours each employee was allocated towards the move, did not know how AFS had calculated the hours, could not describe what services each employee rendered in connection with the move, and had never seen the employee time sheets that would contain this information.  (App. Ex. 1, Jay Vol. I at 81:23-83:19; App. Ex. 25, Dep. Ex. 108).  Further, Mr. Jay did not

know whether the employees were paid additional sums of money above and beyond their regular salary for their purported assistance with the move. (App. Ex. 1, Jay Vol. I at 83:20-23).

Mr. Jay's calculation of internal salaries and operating expenses for 2005 thru 2008 ($1,649,469) is equally lacking in supporting law or facts. With the exception of AFS's employees' salaries that were arbitrarily assigned to Southwest as internal moving costs (as described above), Mr. Jay included *all* of AFS's salaries from mid-2005-2008 in AFS's damage calculation under the guise that AFS was in business solely to meet the requirements of litigation against Southwest. (*See* App. Ex. 3, Dep. Ex. 62 at 7-8 & Sch.7). Mr. Jay did not attribute any of the salaries to contracts that AFS had with parties other than Southwest. (App. Ex. 1, Jay Vol. I at 84:24-85:16; App. Ex. 2, S. Wignarajah [corporate rep. for AFS] Vol. I at 37:15-40:16). *Cf. Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 926-27 (8th Cir. 2005) (affirming exclusion of expert testimony because he imputed entire value of a business to information misappropriated from Storage-Tech when that business had other assets). Performing no analysis, Mr. Jay relied solely on spreadsheets that AFS created and merely copied the sum of the salaries as added up by AFS. (App. Ex. 1, Jay Vol. 1 at 83:24-83:19 & App. Ex. 12, Dep. Ex. 74; App. Ex. 3, Dep. Ex. 62 at Sch. 7). And Mr. Jay conceded that he "didn't come to a conclusion" with regard to whether AFS turning down work to focus on litigating against AFS should influence his opinion on whether Southwest should bear the costs alone. (App. Ex. 1, Jay Vol. I at 85:17-23). Mr. Jay further admitted that he had never seen any time sheets for any of the wage summaries that AFS provided to him and did not know whether employees tracked their time to activities related to litigation against Southwest. (*Id.* at 85:24-86:6). Even though this above-styled lawsuit was not filed until June of 2008, Mr. Jay admitted that he did not segregate out the internal costs for which AFS's time was spent on the prior lawsuit between the

parties or on AFS's other legal matters.  (*Id.* at 86:7-14).  As to the actual wage summary prepared by AFS, Mr. Jay could not identify how AFS calculated the amount of time attributable to Southwest and he conceded that the "wage including fringe" calculation was "obviously an estimate," which was a result of AFS not providing the actual backup documentation to Mr. Jay.  (*Id.* at 86:15-87:24).  The amount of operational expenses Mr. Jay attributed to Southwest Airlines was merely a function of adding bills that AFS provided to Mr. Jay (*e.g.*, rent expense, property taxes, gas, electricity, *etc.*).  (*Id.* at 87:25-88:15 & App. Ex. 26, Dep. Ex. 109).  Once again, Mr. Jay attributed 100% of the invoices to AFS's damages, without any reduction for other business or legal activities that AFS performed during this time frame.  (App. Ex. 1, Jay Vol. I at 90:15-22).  The inclusion of AFS's operational expenses and salaries throughout the course of this litigation as a recoverable damage lacks any factual or legal support and emphasizes AFS's preposterous position that Southwest was required to contract with AFS in perpetuity.

Accordingly, Jay's opinions regarding AFS's relocation in 2007 and its salaries and operational expenses through 2008 are without any basis in law or fact, are unreliable and irrelevant, are based on an unsound or nonexistent methodology, and thus should be excluded in their entirety.

### 7.   *Receivable Losses for Outstanding Accounts.*

Perhaps most absurdly, Mr. Jay also claims damages of $38,101 for losses incurred by AFS on accounts receivable it had with vendors independent of Southwest.  (App. Ex. 3, Dep. Ex. 62 at 8 & Sch. 8; App. Ex. 1, Jay Vol. I at 90:23-91:3).  Without speculating, Mr. Jay could offer no explanation as to how any action Southwest took in the summer of 2005 prevented AFS from collecting receivables from other vendors from 2002 through mid-2005.  (*See* App. Ex. 1, Jay Vol. I at 91:23-93:4).  Mr. Jay was unaware of what efforts, if any, AFS ever made with

regard to collecting on these invoices that were outstanding for years.  (*Id.* at 92:21-24).

Furthermore, Mr. Jay confirmed that he had never seen the underlying invoices that AFS

contends it is owed. (*Id.* at 91:5-13 & App. Ex. 27, Ex. 110).  Instead, he relied solely on a

spreadsheet created by AFS that included twelve invoices from third parties that were allegedly

outstanding; his calculation consisted of merely adding those twelve invoices together, a function

any jury can perform.  (App. Ex. 1, Jay Vol. I at 91:5-13 & Ex. 110).  Simple addition, especially

when there is no confirmation of the accuracy of the underlying data, is not the proper subject of

expert testimony.   Further, the fact that AFS has not received certain payments from other

vendors is entirely irrelevant to this dispute (and unrecoverable under any theory), and thus Mr.

Jay's opinion regarding AFS's accounts receivables should be stricken.  *See* FED R. EVID. 401

and 402.

## IV.  PRAYER

WHEREFORE, Defendant Southwest Airlines Co. respectfully requests that the Court

grant its *Daubert* Motion with Respect to Plaintiff's Expert Stephen A. Jay.  Defendant

Southwest Airlines further respectfully requests that the expert report of Stephen A. Jay be

excluded from evidence and that any testimony by Stephen A. Jay be excluded from trial.

Respectfully submitted,


/s/ Lindsay R. Barton

**ATKINSON, HASKINS, NELLIS,
BRITTINGHAM, GLADD & CARWILE**
A Professional Corporation

John J. Carwile, OBA #10757
Jamie A. Rogers, OBA #19927
525 South Main, Suite 1500
Tulsa, Oklahoma 74101-4524
Telephone:  (918) 582-8877
Facsimile:  (918) 585-8096


and


**CARRINGTON, COLEMAN, SLOMAN
& BLUMENTHAL, LLP**

Kelli M. Hinson, TX Bar No. 00793956
Lindsay R. Barton, TX Bar No. 24050261
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:     (214) 855-3000
Facsimile:      (214) 855-1333
E-Mail: khinson@ccsb.com

***Attorneys for Defendant
Southwest Airlines Co.***

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause in accordance with Rule 5, Federal Rules of Civil Procedure, on this 16th day of May, 2011.

Patrick O'Connor
James E. Maupin
Michael E. Esmond
Moyers, Martin, Santee, Imel & Tetrick, LLP
1100 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
*Attorneys for Plaintiff*

/s/ Lindsay R. Barton