IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AIRCRAFT FUELING SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-CV-414-GKF-FHM |
| ) | |
| SOUTHWEST AIRLINES CO., ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Before the court are defendant Southwest Airlines Co.'s ("Southwest") Motion to Strike Expert and Expert Report of Stephen A. Jay [Dkt. #30], Supplement to Motion to Strike Expert and Expert Report [Dkt. #92], *Daubert* Motion as to Stephen A. Jay [Dkt. #96], and Motion to Strike Amended Report of Stephen A. Jay and Plaintiff's Amended Rule 26 Disclosures [Dkt. #189].

This lawsuit arises from disputes over work plaintiff Aircraft Fueling Systems, Inc. ("AFS") performed for Southwest pursuant to a Master Services Agreement ("MSA"). Under the MSA, AFS provided design and construction management services for fuel storage and other facilities at various airports. Eventually, a falling-out occurred over performance issues and invoicing and accounting procedures. Southwest demanded reimbursement from AFS of over $1.4 million in alleged overpayments. Ultimately, Southwest notified AFS pursuant to § 4(K) of the MSA that it was to cease work on all projects. AFS sued Southwest, asserting claims for breach of contract, quantum meruit and indemnity.

## I. Jay's Expert Report

On May 1, 2009, AFS produced the report of its expert, Stephen A. Jay. Jay is a Certified Public Accountant with a B.S. and an M.S., both in accounting, from Oklahoma State University. He was a staff accountant for Arthur Young & Company from 1972-1976 and managing partner of Lohrey & Jay, Certified Public Accountants, from 1976-1988. Since then, he has been the managing shareholder of Jay & Associates, P.C., which provides financial audit, tax and consulting services to privately owned businesses and individuals. He is accredited in business valuation and certified in financial forensics.

In the introduction to his report, Jay states:

1. I have been retained by the plaintiff Aircraft Fueling Systems, Inc. to provide expert testimony concerning damages, losses, expenses and fees arising from the alleged breach of contract of a Master Service Agreement dated January 1, 2001, between Aircraft Fueling Systems, Inc. (AFS) and Southwest Airlines, Co. (Southwest). Southwest agreed to indemnify and hold harmless AFS "from all claims, causes of action, costs, damages, demands, expenses and fees, injuries, judgments, losses, liabilities, penalties and suits arising from Southwest's performance of its duties and obligations under the MSA" as set out under Section 14(B).[1]

[Dkt. #30, Ex. 1, Jay Expert Report, ¶1]. Jay states that in forming his opinions, he "reviewed various documents applicable to the operations of AFS and costs and expenses incurred in the operation of AFS." [*Id.,* ¶6]. When deposed, he testified he determined the amount of damages AFS incurred by interviewing AFS personnel and reviewing 60 documents provided to him by AFS. Jay testified he did not verify the accuracy or validity of the amounts provided by AFS,

---

[1] Section 14(B) of the MSA provided that Southwest will defend and indemnify AFS "from all claims, causes of actions, costs, damages, demands, expenses and fees (including, without limitation, reasonable attorneys' fees), injuries, judgments, losses, liabilities, penalties and suits arising from SWA's performance of its duties and obligations under this Agreement." [Dkt. #30, Ex. 2, MSA]. The court granted summary judgment against plaintiff on its claim for indemnity on May 19, 2010 [Dkt. #40].

and did not know how AFS calculated some of the figures on which he relied. [#96, Ex. 1, Jay Dep. Vol I at 29:19-31:5].

Jay intends to offer the following opinions:

1. **As a result of actions by Southwest AFS reduced its labor force and incurred significant costs.** Jay states that as a result of actions by Southwest between May 2005 and September 2005, AFS had to lay off 23 employees. The company incurred salaries, taxes and fringe benefits for the terminated employees, as well as expenses for professional career counseling and administrative personnel and higher operating costs in the years 2006-2008 due to higher payroll tax rates resulting from the layoffs. The total cost of the reduction in force was $82,038.

2. **The actions of Southwest regarding nonpayment of outstanding invoices financially strapped AFS resulting in the loss of an order under an existing government contract.** AFS had a contract with the Defense Energy Support Center ("DESC") to provide maintenance of automated fuel handling equipment. AFS was to receive a fifth delivery order under the existing contract at the time Southwest stopped paying it. AFS "became illiquid and could not make timely payments to vendors." As a result, AFS was unable to satisfy the government regarding its financial stability and lost the fifth delivery order for the government contract. The loss from the DESC contract is estimated to be approximately $882,636.

3. **Southwest's nonpayment of outstanding invoices and the loss of other long term contracts resulted in excess facilities and excessive lease expense.** In 2002, AFS entered into a five-year lease for facilities necessary to accomplish its work with Southwest and other customers. Because of the layoffs and "loss of other contracts that occurred after the actions of Southwest," the operations of AFS no longer required the amount of office space that it has leased in 2002. In June 2005, AFS still had two years remaining on its main office lease agreement. In addition to the expense incurred on the main lease, AFS had previously rented additional office space at a cost of $5,763 per month. Apparently, AFS kept the additional space and moved out of the original space. Jay stated that AFS incurred a net expense of approximately $359,265 on its original lease. Additionally, the company had incurred costs of approximately $51,218 for improvements to the space at the start of the original five-year lease. The unamortized cost of the leasehold improvements spread over five years would result in a lost cost of $20,487 over the two remaining years of the lease. Total damages of $882,636 are claimed in connection with the cost of excess facilities and lease expense.

4. **AFS had excess infrastructure costs as a result of the nonpayment of invoices by Southwest.** AFS had one year left on a three-year commitment for a T3 line for internet service at the time of the alleged breach by Southwest. Afterward, it only needed a T1 line, which costs approximately half the amount of a T3 line. As a result, the company incurred $7,055 in unnecessary expenditures for the T3 line.

3

>   Also, the company had to spend $1,500 to remove the furniture from the office and monthly fees of $229-$473 to store the furniture. The stored furniture was eventually given to the storage company in exchange for rent. The loss on furniture and equipment, including removal costs, is estimated to be $221,761.
>
> 5. **"As a result of Southwest's actions, AFS suffered adverse liquidity and incurred significant costs as a result."** AFS claims damages for fees paid to attorneys and accountants and late fees and penalties to the IRS, for a total cost of $422,138.
>
> 6. **As a result of the actions of Southwest the company had to move its operations to a new location.** The cost of the move was $383,331. Additionally, AFS was required to continue to employ staff, maintain a large quantity of files and documents maintain certain items of IT equipment and incur operating costs—all for the purpose of dealing with issues relating to the litigation with Southwest. Those costs totaled $1,649,469.
>
> 7. **AFS incurred losses for several outstanding accounts receivable in the performance of its contract with Southwest.** AFS claims $38,100.55 for account receivables for work performed before June 1, 2005, for clients other than Southwest. AFS appears to contend the termination of the MSA prevented it from collecting the account receivables from unrelated clients.

Jay's seven opinions cite eight attached schedules he prepared, which list the alleged damages in various categories.

## II. Motion to Strike and Supplemental Motion to Strike

Southwest's first Motion to Strike [Dkt. #30], filed before its summary judgment motion was resolved, asserted that Jay had done nothing more than accept at face value costs claimed by AFS and add up the numbers—a task Southwest characterized as "engaging in basic arithmetic." Southwest argued the testimony was inadmissible under *Daubert* standards because the jury was capable of performing the same arithmetic tasks.[2] Further, it argued the types of damages described in the report were consequential damages, which are precluded under § 7(A) of the MSA.

---

[2] Southwest also attacked the opinions on the basis of reliability, arguing that Jay did little or nothing to verify the costs claimed by AFS. That issue is more full addressed in § III below.

AFS claimed Jay's opinions were admissible because "Jay has specialized knowledge that would be helpful to a jury in calculating the amount of Plaintiff's indemnification claim," and "the calculations performed by Jay are based on reliable information furnished by Plaintiff." [Dkt. #38 at 8]. AFS vigorously asserted the basis for the damages in Jay's report was the indemnity provision of the MSA, §14(B), and the damages were *not* consequential. [*Id.* at 7]. During the summary judgment hearing, counsel for plaintiff stated he agreed with Southwest's counsel that plaintiff could not recover consequential damages, but reiterated his argument that the damages were recoverable under the indemnity provision. [#78, Transcript at 89:11-22].

After the court granted summary judgment against AFS on, *inter alia*, its indemnity claim, Southwest filed a Supplement to its Motion to Strike [Dkt. #92], asserting the court's summary judgment ruling rendered Jay's report irrelevant. Southwest contended that the damages were not recoverable as indemnity damages based on the court's summary judgment ruling; were not recoverable as consequential damages under Section 7(A) of the MSA; and were not direct damages.

AFS responded by arguing that the court did not explicitly rule plaintiff could not recover consequential damages and therefore, despite plaintiff's previous statements to the contrary, plaintiff is entitled to seek the losses it previously sought under the indemnity provision because the losses were "foreseeable consequential damages." [Dkt. #93 at 1-4]. Further, it asserted Section 7(A)'s prohibition against consequential damages applies only to warranty duties. [*Id.*

Section 7, of the MSA states, in its entirety:

"<u>WARRANTIES; DISCLAIMERS AND LIMITATION OF DAMAGES:</u>"

A.  Upon written notice received by AFS within one (1) year of the completion of a project, AFS agrees to correct or otherwise remedy all engineering, design and construction services rendered by AFS, its agents, employees, contractors and subcontractors under this Agreement and materials incorporated into the Facilities

5

>    by AFS (excluding equipment, materials and supplies manufactured by others) found not to be of good and workmanlike quality, or not free of material defect in workmanship or not in conformance with all applicable building codes and standards, including those of the airport authority, and all other laws, rules, regulations, requirements, and agreements, including the relevant provisions of the Lease, as may be applicable thereto; provided that *neither party shall be liable to the other party for consequential damages arising from either party's performance under this agreement.*  This warranty is voided by misuse, accident or improper operation of the Facilities, except to the extent such misuse, accident or improper maintenance is caused by AFS, its agents, employees, contractors or subcontractors.
>
> B. AFS shall provide SWA with copies of all warranties issued by equipment, material and supply manufacturers relating to any and all equipment, material and supplies installed at the Facilities:  AFS SHALL CAUSE ALL WARRANTIES TO BE ASSIGNED TO SWA AT AFS' SOLE COST AND EXPENSE.

[#30, Ex. 2, MSA § 7] (emphasis added).

The plain language of the provision contradicts the interpretation urged by plaintiff. Further, Southwest has no warranty obligations under the MSA; therefore, it makes no sense to construe the language as precluding recovery of consequential damages by either party but only with respect to warranty claims.

Under Texas law, provisions excluding consequential damages are enforceable. *See Morgan Bldgs and Spas, Inc v. Humane Society of Southeast Tex.,* 249 S.W.3d 480, 491-92. Thus, even assuming plaintiff is not estopped based on its prior counsel's representations to the court from arguing the damages at issue are consequential damages rather than indemnity damages, their recovery is precluded under Section 7(A) of the MSA.

Additionally, Fed.R.Civ.P. 9(g) provides that when "an item of special damage is claimed, it must be specifically stated." The Tenth Circuit has explained, "Special damages depend on particular circumstances of the case; general damages, on the other hand, are the ordinary result of the conduct alleged." *Weyerhaeuser Co. v. Brantley,* 510 F.3d 1256,1266 (10th Cir. 2007). "Consequential, or 'special,' damages, … are those unusual or indirect costs

that, although caused by the defendant's conduct in a literal sense, are beyond what one would reasonably expect to be the ordinary consequences of a breach." *Texas A & M Research Foundation v. Magna Transportation, Inc.,* 338 F.3d 394, 404 (5th Cir. 2003). "The common law rule is that special or consequential damages are not usually recoverable in an action for breach of contract." *Paper Magic Group, Inc. v. J.B. Hunt Transport, Inc.,* 318 F.3d 458, 461 (3d Cir. 2003). Plaintiff did not plead consequential damages in its Petition. [Dkt. #2-1]. Thus, it is not entitled to seek consequential damages at trial.

Southwest's Motion to Strike [Dkt. #30] and Supplement to Motion to Strike [Dkt. #92] must be granted.

### III. *Daubert* Motion

Defendant asserts Jay's expert testimony should be excluded under *Daubert* because it is neither relevant nor reliable.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

When an objection to an expert's testimony is raised, the court must perform *Daubert* gatekeeper duties before the jury is permitted to hear the evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999). A trial court's gatekeeper duty requires two separate inquiries: (1) the witness must be qualified to offer the opinions he is espousing and (2) the proponent of the witness bears

the burden of proving by a preponderance of the evidence that its witness's opinions are both relevant and reliable. *Kumho Tire,* 526 U.S. at 141, 152.

Regarding reliability, the Supreme Court identified four nonexclusive factors the trial court may consider:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing;
> (2) whether the opinion has been subjected to peer review;
> (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operations; and
> (4) whether the theory has been accepted in the scientific community.

*Daubert,* 509 U.S. at 593-94. This list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *Dodge v. Cotter Corporation,* 328 F.3d 1212, 1222 (10th Cir. 2003), citing *Kumho Tire Co.,* 526 U.S. at 150 (1999). "[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire,* 526 U.S. at 141-42.

The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. *Kumho Tire,* 526 U.S. at 152. The court in *Kumho* stated:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times to useful to ask even if a witness whose expertise is based purely on experience, say a perfume tester able to distinguish among 140 odors at a sniff, whether is preparation is of a kind that others in the field would recognize as acceptable.

526 U.S. at 151.

It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist. *Dodge,* 328 F.3d at 1222. "Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1222-23.

The second prong of the *Daubert* inquiry concerns relevancy or "fit." The trial court must conduct inquiry into whether proposed testimony is sufficiently "relevant to the task at hand." *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1234 (10th Cir. 2005) citing *Daubert,* 509 U.S. at 597. A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. *Bitler,* 400 F3d. at 1234. "Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'" *Id.*

### a. Reliability

Plaintiff has the burden to show that Jay's testimony is reliable, which requires that his opinions are based upon sufficient facts or data; the product of reliable principles and methods; and the product of a reliable application of those principles and methods to the facts of the case. *In re Williams Securities Litigation,* 496 F.Supp.2d 1195, 1233 (N.D. Okla. 2007). When evaluating the reliability of expert testimony, the court must focus on the methodology used to reach the conclusions rather than on the actual conclusions reached by the expert. *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233 (10th Cir. 2004), *cert. denied sub nom White-Rodgers Co. v.*

*Bitler*, 546 U.S. 925 (2005). This includes assessing whether the expert has adequately accounted for alternative explanations or causes. *In re Williams,* 496 F.Supp.2d at 1234-35.

Defendant argues Jay's methodology was deficient because, *inter alia*, he relied on summary documents of alleged damages provided by AFS without reviewing underlying supporting documentation. The court agrees Jay's methodology renders his opinions unreliable.

### b. Relevance

The touchstone of admissibility of expert testimony is its helpfulness to the trier of fact. *Hayes v. Wal-Mart Stores, Inc.,* 249 F.Supp.2d 1249, 1251 (E.D. Okla. 2003) citing *Wilson v. Muckala,* 303 F.3d 1207, 1219 (10th Cir. 2002). Jay's opinion explicitly relied on the indemnity provision as the basis for the claimed damages. The court granted summary judgment against AFS on its indemnity claim. Therefore, Jay's opinion is not relevant.

Southwest's *Daubert* motion [Dkt. #96] must be granted because Jay's opinion does not meet *Daubert* requirements for reliability or relevance.

### IV. Motion to Strike Amended Report of Jay and AFS's Amended Rule 26 Disclosures

Jay's original report was served on defendant on May 1, 2009. The deadline for plaintiff to identify its experts and provide reports was January 31, 2011. [Dkt. #77]. Southwest deposed Jay on May 5, 2011. On September 8, 2011, plaintiff served on defendant an Amended Report of Stephen A. Jay and "amended" Rule 26 disclosures. In the amended report, Jay made several corrections to the original report. The corrections relate to errors in the original report which were exposed during Jay's deposition and which he admitted needed correction. Additionally, he deleted Paragraph 1 of his original report, which had stated that Southwest had agreed to indemnify AFS for losses under Section 14(B) of the contract. Finally, Jay added a new opinion and schedule (Opinion 8 and Schedule 9) summarizing plaintiff's claim for unpaid invoices

"based on an analysis prepared in 2008…to reconcile outstanding claims between AFS and Southwest Airlines." As set forth in Schedule 9, Jay opines Southwest owes AFS $8,788.193.33. Two items have been added to the list of documents Jay reviewed in preparing his report: a copy of the SWA Audit 20060111 and copies of invoices to Southwest from AFS. [Dkt. #189, Ex. A at 32].

Southwest objects to the new Opinion 8 both because the addition is untimely and unreliable.[3]

Rule 26(a)(2) requires that the expert report contain a "complete statement of *all opinions* the witness will express and the basis and reasons for them." A party's failure to disclose the identity of an expert witness or provide a timely expert report requires the court to automatically exclude expert testimony unless the violation of Rule 26(a)(2) was justified or was harmless under the circumstances. Fed.R.Civ.P. 37(c)(1); *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 951-52. (10th Cir. 2002). A court may exclude specific opinions or bases for the expert's opinions that were not fairly disclosed in the expert's report. *Keach v. United States Trust Co.,* 419 F.3d 626, 641 (7th Cir. 2005).

Opinion 8 regarding unpaid invoices and contractual late fees was not included in Jay's original report and was not disclosed until more than seven months after the expert report deadline and four months after Jay's May 5, 2011, deposition.

Rule 37(c)(1) states:

> ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (3), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard;

---

[3] Southwest also reiterates its objection to Jay's original seven opinions, but states that if those opinions *are* admitted, it does not oppose the corrections made in the Amended Report.

> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

In determining whether evidence should be excluded under Rule 37(c)(1), courts consider four factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999).

The late addition of Opinion 8 is clearly prejudicial to Southwest, which has already invested significant time and resources deposing Jay and AFS witnesses, engaging in motion practice regarding his timely-disclosed opinions, and have a rebuttal report prepared by an expert. Southwest has had no opportunity to depose Jay about the new opinion and its expert, Robert Lang, has had no opportunity to address the new opinion in his rebuttal report. Moreover, Southwest was not able to include the new opinion in its motion to strike. Southwest also contends the addition of claims for "late fees" on invoices is entirely new. The prejudice cannot be cured unless Southwest is given an opportunity to re-depose Jay and possibly other AFS witnesses and engage in additional motion practice. This would disrupt the trial, which is set for December 19. Thus, the first three factors weigh in favor of striking the new opinion.

Regarding the fourth factor, a "willful failure" is defined as "any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown." *Hudgins v. Vermeer Mfg. Co.,* 240 F.R.D. 682, 685 (E.D. Okla. 2007) citing *In re Standard Metals,* 817 F.2d 625, 628-29 (10th Cir. 1987). Plaintiff's conduct clearly meets this standard. Jay's new opinion

is not based on any newly discovered evidence, and plaintiff has offered no excuses for its failure to comply with Rule 26(a)(2).

AFS has failed to carry its burden of showing the violation of Rule 26(a)(2) is either justified or harmless. Therefore, Southwest's Motion to Strike the Amended Report [Dkt. #189] must be granted. This does not, however, preclude AFS fact witnesses from testifying about the nature and amount of claimed direct damages.

## V. Conclusion

For the reasons set forth above, Southwest's Motion to Strike Expert and Expert Report of Stephen A. Jay [Dkt. #30], Supplement to Motion to Strike Expert and Expert Report [Dkt. #92], *Daubert* Motion [Dkt. #96] and Motion to Strike Amended Report of Jay and Plaintiff's Amended Rule 26 Disclosures [Dkt. #189] are granted.

ENTERED this 8th day of December, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma